Good morning. May it please the court, my name is Joseph Schlesinger. I represent the petitioner Thomas Francis Edwards. With me at council table is co-counsel Daniel Romano. I'd like to reserve five minutes of my time for rebuttal. Petitioner's appeal involves two substantive orders of the district court. Two separate orders. What we call the FMO or the final memorandum in order issued by Judge Carney in March 14, 2005 as modified by his order denying the Rule 59 motion for new trial entered on May 5, 2005. And then a separate order issued by Judge Huff in August 2001 regarding the constitutional challenge to lying in wait. The final memorandum in order, although it's not stated in the order, is a grant of a motion for judgment on partial findings under Federal Rule of Civil Procedure 52C. The hearings that were conducted in December 2004 were on Brady materiality and Strickland prejudice as a result of a bifurcation order that Judge Huff issued. In the middle of the hearing, Judge Carney invited the state to move for judgment on partial findings based on an indication that he may have felt that our prejudice showing was not sufficient. The state took him up on the offer and at the end of our case in chief, the hearing was aborted and the state never put on any evidence. As a result, with one important exception, which has to do with Brady's suppression, there are no findings on any factual areas of historical fact in the case. The ruling is limited solely to prejudice at guilt phase and prejudice at penalty phase. Now this has, I think, a very important effect on the scope of the appeal. Judge Carney decided to limit his findings to prejudice and requested the state or encouraged the state to ask him to do so. So now the state in their supplemental brief has argued a host of issues that it thinks Judge Carney could have or should have made findings on. But assuming the state's not stopped from doing that, that's not an argument, in our view, for affirmance of the judgment. They may be arguing that the case should be sent back to Judge Carney for further findings, but they can't, for the reasons stated in our brief, ask this court to affirm by making additional findings. Now I know the court's familiar with the facts of the case, but I do want to touch briefly and clarify a little bit some of the Brady suppression facts. They're set out in detail in Judge Carney's FMO, Final Memorandum and Order, at pages 20 through 27, but there are a couple of areas where they may be a little confusing and one area where it doesn't fully explain the significance of his findings. So as I know the court knows, Mr. Edwards' files from Patuxent Institution, the mental slash penal institution where he was housed for many years, were over at the courthouse in Maryland when this crime was being committed in California and everybody was looking for the files in the wrong place in the courthouse. Can you tell us specifically what you found in the Patuxent records that you didn't already have? Yes, Your Honor. We presented extensive evidence of that. That was the bulk of our second evidentiary hearing. The evidence, although some evidence, was presented on that at the first evidentiary hearing. It comes from multiple sources. One of the principal sources was Dr. Jephthah. No, no, that's not my question. What was in the record that you got belatedly that the trial counsel didn't have in his possession already? I'm sorry, Your Honor. I was coming to that. Then you're telling me what you were going to do with the evidence that you got. I'm asking you what specific piece of paper? Well, the file was 448 pages long. We submitted an exhibit before Judge Hub that marked page by page which pages counsel already had and which pages he didn't have. Tell me a key thing, a key fact that was in the papers that you got belatedly that you didn't already have. There were several, Your Honor. One that trial counsel thought very significant was a probation officer report. He testified that in 30 years of being a criminal defense attorney, he had never seen such a helpful statement from a probation officer. The statement was, Mr. Edwards was indeed a pathetic person who had been the victim of environmental circumstances far beyond his control. Dr. Victoroff went- Counsel, let me stop you there. What was new there that you didn't already know? What was new is that you had a probation officer saying it. Well, what did the probation officer tell us in terms of facts that we didn't already know? Didn't we already know that Edwards had had a pathetic upbringing? We knew that his adopted mother was an alcoholic. We knew that he had had a rough go of things for a long time. His father had died. His uncle had committed suicide. Counsel knew some of these things, Your Honor. That is correct. What he thought was significant about that is he didn't have- he was concerned that some of these things would be viewed as not particularly sympathetic to Mr. Edwards. Because at the same time, all these things, and Your Honor has alluded to some of them, were happening to Mr. Edwards. Mr. Edwards was acting out in ways that we wish a capital defendant wouldn't act out in. What you have in the probation officer's report is not new facts. What you have is a sympathetic opinion by a quasi-law enforcement official in Maryland. That's correct, Your Honor. And Counsel's testimony was he thought that was very significant. Mr. Schlesinger, let me just- I may not fully understand this, but basic records that you are talking about that the government did not turn over were the records of his- when he was- medical records relating to his- I don't want to use incarceration, confinement, whatever, this facility in Maryland. Commitment would be. Yeah. Now, did the government have the only copies of these things? Counsel was able to get- well, let me- the government had the original, Your Honor. It was subpoenaed to court. The original copy was in the court file and then turned over to the Maryland State's attorney who then told the prosecution they had found the file. And that was significant because they told the Orange County prosecution that they had found the file while the second penalty trial was still going on. Orange County didn't actually get the file and it was a copy at that point. The defendant- they were his records. Couldn't he have obtained them? The defense tried to, Your Honor, and the story everyone got when they went to the institution was they're over at court. They got subpoenaed over to court when Mr. Edwards was having a proceeding there. They all- both the defense and prosecution went to court. They made a critical error. They looked only under a criminal case where the case where they were actually subpoenaed to was sort of the equivalent of a habeas. It was a civil or miscellaneous proceeding to redetermine his status as a defective delinquent. So they were there in court. The word came back. They were probably destroyed. Both sides relied on it at that point. The government wasn't withholding anything exculpatory from the defendant at that point? They were not. They didn't have them yet. They also thought the files had been destroyed. In 1984, the files surfaced because a Maryland detective, Detective Toomey, was looking into a cold case that Mr. Edwards had been a suspect in, found the file immediately, told Orange County, I found that file- Orange County prosecution, I found that file you were looking for. Now, I want to come back, if I may, to Judge Silverman's question because I know that's something- But wait a minute. So at what point was there a Brady violation? Two points, Your Honor. On June 5th, 1985, Detective Mann in Orange County was told, I have found that file. It exists. Our contention is that's one Brady violation for not telling the defense because the prosecution had informed the defense that it existed. Who told the prosecution it was found? Detective Toomey from the Maryland County Police Department told Detective Mann in Orange County, I have found that file you're looking for. That's reflected in- Did the government have it then? No, it did not have it then. So there was no Brady violation then? Well, our contention is the information was information they had to turn over. They didn't have documents in their possession at that point, but they needed to turn it over. They needed to advise the defense that the file had been found. But, Your Honor, then on September 23rd, 1986, while the penalty trial is going on, Detective Mann in California calls Maryland at 6 a.m. California time and says, I need you to FedEx that file to me. We need it for the penalty phase. Detective Toomey does that. He saves his receipt. He asks for reimbursement from the office and does a memo about the circumstances. It's FedExed, or we didn't have FedEx in those days. It was overnighted to California and arrived there in the middle of the penalty trial, the final penalty trial. At that point, they have the 448-page file and they do nothing with it. They don't tell the defense. I don't think they have to. The defense made yeoman efforts to keep out any mention of what happened at Patuxent. Well, that's partly because they didn't have the file. They knew the defense wanted the file because the defense had moved for discovery of all psychiatric records that the prosecution may come into possession of Mr. Edwards. That was granted. There was an order to do that. They knew that mental status was the only issue in the case. And they made a calculated decision. They didn't want to bring up pre-1977 facts. That's correct, because they didn't have the file. No, they knew a lot about his pre-1977 life, as a matter of fact. Yes, but the prosecution didn't know exactly what had gone into the – they didn't know what the defense knew at that point. That's only as a result of the discovery and federal – That would seem to make Judge Silverman's earlier question quite relevant then. What was in the 488 pages that the defense didn't have before? You told me a probation officer's report. What else did you have? Yes, there was evidence of head injuries with loss of consciousness. Are you referring to the fainting spell thing? No, that's in addition to the fainting spell. There are head injuries where Mr. Edwards is struck by other inmates. There is the loss of consciousness that is variously reported as a fainting spell or a grand mal seizure or a hysterical seizure. Dr. Bickdorf testified regardless of what it was exactly, that was something that they needed to know about. As far as the fainting spell, he was taken to the hospital after that event and found to be – check out okay neurologically, is that right? He was given an EEG, which does not rule out – Whatever they gave him came out of there with a clean bill of health as far as his neurological condition. As far as they could tell, he had not suffered a grand mal seizure. Or any other neurological diagnosis? As far as they could tell, it checked out normal. Again, that does not rule out abnormal. No, but I mean as far as what the records say, the record comes back about – He had a very unusual event where he was found unconscious, shaking in his cell. Dr. Bickdorf testified regardless of what they diagnosed or did not diagnose that at the time, that was something that needed to be looked into further. The trial neurologist, Dr. Starr, and the trial neuropsychologist who also testified at the hearing both said, had they known about that, they would have done a more thorough investigation or evaluation than they did at the time of trial. In addition, Dr. Bickdorf found very significant the fact that there were repeated statements in the Patuxent file that Mr. Edwards is impulsive. And he thought that was very diagnostically significant for the frontal lobe damage that he diagnosed. Repeated reports of impulsivity is diagnostically significant neurologically. You're saying they didn't know he was impulsive before they had these records? Well, there's having an idea that he's impulsive, and then there's having people who have poke-prodded and observed him for 14 years documenting it. It's one thing to say, well, I talked to Mr. Edwards' neighbors, who the state has criticized us for using, and they said he was impulsive. And there are issues of hearsay, and there's issues of reliability, there's issues of credibility and accuracy of that recording. And then there's a whole other area where mental health professionals trying to figure out what's wrong with Mr. Edwards say over and over again, he acts without thinking, he's impulsive, which, of course, was the defense that they were trying to put on to the trial, the issue he was charged with that he had a trial on. Which would have been a defense to what? Premeditation. Premeditation. And deliberation. Diminished capacity, acting impulsively and failing to meaningfully and maturely weigh the pros and cons of an intended course of action is the diminished capacity defense. And impulsivity is, in many instances, the crux of that defense. Mr. Schlesinger, was there anything else besides those, you've given us sort of three classes of documents, anything else in that file that would have been, would have had a bearing on the kind of defense he would have brought? Well, counsel also testified that the mere fact of having the complete record, he thought, was very important because he thought his experts would be subject to cross-examination, that they really didn't have very complete information on Mr. Edwards. Can you tell us roughly how many pages of the 488 counsel had not seen before? The pages he had seen before were the minority, Your Honor, and I don't remember the exact number. We tabulated them. I think it was on the order of 30 pages that he had seen before. But as I say, I don't have a clear record. Some 450 pages then were new? Four hundred and, I'm sorry. I think it's 488 is the. No, 448. So about 400 pages were new, I think, Your Honor. I would be happy to look that up. It's in the record, but as I say, I don't have a clear recollection on that. He made an argument of impulse, that he was impulsive? Well, at trial? Well, it wasn't really much of an argument. It was we don't know why this happened, so that. The impulse would have gotten him any place in light of the facts that he followed? In light of the facts surrounding the. The facts surrounding. Absolutely, Your Honor. To talk about the prejudice at the guilt phase, there's certainly a huge number of cases where an ineffective assistance of counsel claim or just any kind of claim that a diminished capacity defense should have been put on, loses and habeas due to the overwhelming evidence of premeditation. And we cite Keith Daniel Williams as an example of that in the brief. Here the evidence was very weak and circumstantial, Your Honor. It was basically a process of elimination type proof. We all know from common experience that a serious event like attacking two girls walking down a road, usually doesn't happen unless the person's thought about doing it first, or they're provoked in some way, or they're mentally ill. So the evidence was there was no provocation of any kind, and they heard nothing about mental illness. So the simplest, most natural conclusion is he must have thought about doing this before. There was some evidence he may have seen them a few minutes before, although the evidence on that is not terribly clear. Counsel, were there ‑‑ if the defense had chosen to admit any of the documents that were found in the new materials, would that have opened the door to the prosecution to have admitted other things that were in his file from Patuxent? Admitted other things in the file in Patuxent? Oh, I think probably, Your Honor. Now they have some ability to pick and choose. Was there anything in the additional 400 pages that would have been adverse to Mr. Edwards that the prosecution would not have had access to previously? Well, the prosecution knew all of this background as well, and most of what they were interested in. Presumably, there were pages that they hadn't seen before, right? You told me the defense counsel had only seen about 30 pages. Did the prosecution have more than that? They knew the overall parameters of Mr. Edwards' background and the things they wanted to introduce they already knew about. So the fact that ‑‑ There was no additional evidence in the new pages that would have gone to the question of the sexual fetishes or the way that he treated other people or that staff at Patuxent regarded him as a danger once he was released? Well, they knew that Patuxent clearly ‑‑ Was there any additional pages or additional ‑‑ I'm sure there are, Your Honor. I haven't gone through it that way. But there are a lot of pages in there that talk about Mr. Edwards in a not very complimentary fashion. So any prosecutor worth his salt would have been able to argue some of those things in response to a mitigation case that Mr. Edwards is a pathetic person who's been the victim of circumstance. Certainly they would say, well, but there's this report from this jailer who says he's a nasty guy. But ‑‑ and that gets into the double‑edged statement that Judge Carney makes. I think clearly there is some double‑edged material in here. I think there's debate about how much would come in and counsel could pick and choose his theories and be as good as the state has given counsel credit for in trying to cordon out bad areas. But certainly some would come in. But that's not fatal to a mitigation case. The question overall is, does the case have mitigating value? Are there also some not so mitigating things coming in? The Ainsworth case tells us double‑edged mitigation can be ‑‑ the failure to present double‑edged mitigation can be prejudicial. The Terry Williams case from the U.S. Supreme Court tells us the same thing. Justice Stevens says, to be sure, not all the evidence was favorable to Mr. Williams, but what was left out was prejudicial to him. I think we have to bear in mind this was a very close penalty phase case. And we've briefed that, but just to hit the salient facts, the first penalty phase hung. The third ‑‑ between the first and third penalty phase, Judge Judge, the trial judge, wrote a handwritten letter to the parties saying he thought LWOP was an appropriate sentence in this case and wouldn't the parties like to settle the case. Then the third penalty jury is out for three days and sends out three notes asking either for clarification of the instructions or a testimony to be re‑read. So it's our position, Your Honor, it wouldn't have taken a lot of mitigation to turn the tide here. Even a little would be prejudicial on those facts. But we think there's quite a lot. There's some of the social background that Your Honor has already alluded to, the death of his father, the death of the headmaster in the school he got sent to that he'd been very close to. But counsel already knew all that. Defense counsel already knew that. No, but that's not ‑‑ that's the prejudice, Your Honor. The Brady and Strickland prejudice in this type of case is a two‑step process. This Court's case, Jennings v. Wood. But don't you have to show counsel that had defense counsel had access to the additional materials from Patuxent, that they would, that counsel would have changed his defense strategy? The Jennings says that there is a reasonable likelihood that competent counsel would have made a different, would have changed his strategy. And we have amply demonstrated that. Trial counsel testified at length. This was a very, very close question for him. He was constant. He was not happy about the decision to leave out all information about the client's background prior to 1977. Because jurors aren't stupid. They know they're not being told something about the client. And it's not very humanizing to hear that for the last four years he's been nice to children and nice to his coworkers. It's essentially he's a great guy when he's not shooting 12‑year‑olds. That's not much of a mitigation case. So counsel was very torn about that. I guess I'm a little confused as to where you're going. As I understand it, you have sort of two different arguments related to these materials. One is a Brady argument. That is that the government withheld and knowingly withheld information from you which you are entitled to. There's a prejudice component there, I think. Yes. And I think it's your obligation to show that if they had had access to these additional materials, that they would have changed their theory of the case. Yes. Jennings says reasonably likely that they would. Now, that's a little different from the Strickland argument that you want to make. The Strickland argument, as I understand it, is from the outset counsel made a bad decision. I'm addressing the Brady, Your Honor. And actually it wasn't from the outset. It was failure to find the Patuxent files and do some other things led to a bad strategy decision. But just focusing on the likelihood that he would have made a different strategy decision, he said, I was looking for a reason to make the other strategy decision. One of the things that concerned me is I didn't have a diagnosis of Edward's condition. All my experts said there's something clearly wrong with him. I don't know what it is. And he was very concerned about putting that on. Our case supplied that diagnosis both through independent, not independent, but our experts, habeas experts, and the trial experts. The trial experts endorsed what the habeas experts did and said, if I'd known about the Grand Mall seizure and some other things that were in the file, the head injuries and that sort of thing, I would have done the kind of workup that habeas experts did. And I agree with their conclusions. So the conclusions we had were temporal lobe dysfunction, which leads to emotional difficulties, overattachment to people and things, very much the kind of thing that Mr. Edwards was going through with his wife. Sexual fetishes, by the way, also result from temporal lobe dysfunction. And frontal. You know, what was it that, I guess, where do we, the temporal lobe dysfunction diagnosis is where? That's through neuropsychological testing. They had. When was that, was that in the Patuxent papers? No. The neuropsychologist who had been retained by trial counsel said, I did a screening battery that was not particularly thorough. If I had seen what was in the Patuxent documents and seen all these indications of possible neurological problems, I would have done a very much more thorough battery. And when a thorough battery was done, it showed significant temporal lobe dysfunction. So the answer to your question is no, the file did not itself show temporal lobe dysfunction. It showed problems that led a competent expert to do more thorough testing. That would have turned into what kind of argument at trial that would have had a difference? Trial counsel said, and then there was also frontal lobe damage diagnosed by the neurologist. Trial counsel said, if I'd had those organic brain deficit diagnoses, I very likely would have opted to put on a mental health defense because that was one of the things I was worried about. I was not very, I didn't think it would be very persuasive to a jury to hear from experts, Mr. Edwards has problems, but we're not so sure what they are. Didn't Dr. Walsh test for brain damage when she examined him in the 80s? Yes. She said she gave a test that's over 90% accurate in distinguishing this? The testimony is the golden battery is about 90% as good as a full Halstead Ray-Tan battery. She gave whatever she had there. She gave the golden battery. There's nothing wrong with him neurologically? No, she said there is something wrong with him. Neurologically? Yes. Her test results showed temporal lobe abnormalities. They were not very significant, and she didn't follow up on them, but they were consistent with the results on the full battery that was given by habeas experts, and she said she agreed with that. What about Dr. Klatt? What did he find in 81? Dr. Klatt believed Mr. Edwards was suffering from diminished capacity. He was the principal one that said, I think there is something clearly wrong with him. I don't know what it is, and he says, I think in about 20 years science will advance far enough to know what it is. He's a neurologist and a psychiatrist? Dr. Klatt, as I recall, is just a psychiatrist. I have him down here as also a neurologist. I don't think that's correct, Your Honor. In any event, there was no neurological diagnosis from that guy. That's right. He did not diagnose frontal lobe deficits. Mr. Klatt, use your card. I'll give you a few minutes on rebuttal, but are there any further questions? No, thank you. Thank you, Your Honor. May it please the Court, Garrett Beaumont for appellee. Edwards received the benefit of two final district court judgments on his ineffective assistance claim. The first final judgment was District Judge Hupp rejecting his claim of ineffective assistance to counsel under prong one of Strickland. It wasn't tentative. It was final, and that was August 20, 2003, R.T. 57-62, read into the record. His tentative follow-up minute order to that first phase one evidentiary hearing only concerned other issues that he hadn't discussed yet. Judge Carney only ordered phase two of the evidentiary hearing on the prejudice phase to give this Court the benefit of two rulings rather than one. So it's not true that there was one ruling, the FMO. That's not true. There were two rulings, one rejecting Strickland under the first prong, the second rejecting Strickland under the second prong. District Judge Carney gave the following reason when he ordered phase two originally, quote, In the interest of fairness and to provide a complete record for appellate review, the second part of evidentiary hearing in this case will take place, as contemplated in Judge Hupp's original phase five management order. The second part will be limited to petitioner's mental health claims, which meant his competency to stand trial claim, which was tentatively rejected by Judge Hupp and rejected again by Judge Carney, and materiality under Brady and prejudice under Strickland. Now, that was the March 23, 2004, order for status conference and submission of budget. It's clerk's record or clerk docket 304, but that was the original reason he ordered the second evidentiary hearing. When he said he wasn't going to revisit Judge Hupp's ruling, it was because it was a final rule. That is just as much part of the record as District Judge Carney's FMO, which was solely on the ground of prejudice, and it was solely on the ground of prejudice, because District Judge Hupp had already made a final ruling, rejecting the claim under phase one of Strickland. And Judge Carney reemphasized this at the end of the phase two evidentiary hearing. After I made my 52C motion and both sides argued, Judge Carney began by saying, with respect to his Strickland claims, Mr. Edwards must prove, excuse me, he began by saying, I strike that, he began by saying, quote, this phase of the evidentiary hearing focused on Mr. Edwards' Strickland and Brady claims, and more specifically the prejudice element of those claims from my perspective. December 17, 2004, RT 76. So the reply brief, supplemental reply brief of Edwards, makes much of the fact there's only one ruling. That's not true. There are two factual rulings. And both of them reject the Strickland claim under each prong of Strickland. Now, when District Judge Hupp made his final ruling, he stated that he found that Edwards' state court trial, he made a knowing, tactical, and professionally reasonable decision to avoid jury defense or mitigation case based on organic brain damage in Edwards' Maryland Patuxent background. He made the following express findings. The defense trial court defense team went back to Maryland to investigate the case from its beginning. Edwards' state court trial team thoroughly investigated the case, knew all the facts, maturely deliberated over what the defense tactic should be, and made a tactical decision that a competent and experienced lawyer would have made. The suggested pre-1977 history would have done the defense more harm than good had it been presented. Now, he made this statement, and Appelli argued this throughout both evidentiary hearings, because we're really talking about the same thing. If the defense suggested behaviors is more harmful than beneficial, trial counsel obviously didn't make a professionally unreasonable decision when they decided not to present it. The other factual finding that District Judge Hupp made, Giannini, the lead trial counsel, had no persuasive evidence supporting a trial court defense that when Edwards committed the crime, Edwards had any diminished capacity based on organic brain damage or Edwards' Maryland history. Even after consulting with many mental health experts who examined Edwards and provided Giannini with their results, and even after Giannini's careful consideration of all the historical information the state court trial team retrieved from Maryland, Giannini did not perform in a professionally unreasonable manner by failing to discover all the protection records for himself. This is another specific finding by Judge Hupp, although that's a mixed finding of fact and law. In any event... What were the state court... Pardon? What were the state court findings on these cases? The state supreme court, well, first of all, there were two state courts involved here. The first was the state trial court, which heard the Maryland evidence at the modification hearing from Judge, from Dr. Clady, who was a psychiatrist, Dr. Sharma, who was also a psychiatrist, or a psychologist, excuse me, and the director of education from Patuxent, who was personally subpoenaed by the Giannini team. They interviewed Edwards, by the way, for 16 hours pre-trial before he would no longer cooperate. They testified in great detail about his Maryland background, Patuxent, his alleged genetic defects, possible head injuries, and the trial judge found this was more harmful than helpful because it would have revealed a sexually sadistic motive for the crime and would have buttressed rather than hurt the premeditation case of the prosecution. Counsel, why didn't you turn over the pages you received from Maryland during the trial? Why did what? Why did the prosecution not turn over the 400-plus pages that came in? Because it had no idea that they would have any relevance whatsoever. The prosecution, according to District Judge Huff's findings, which were adopted by District Judge Carney, received the Patuxent files one week prior to the end of the penalty phase trial. Throughout the guilt phase and penalty phase trial, Edwards had, as Carney said, specifically tried to exclude all evidence from Maryland. That's true, but why would you? Then what is the harm in turning over these pages to the defense? There isn't any harm in turning over the pages to the defense. It was just something that I can just say, first of all, it was Captain Mann, who was investigator, who got them. The prosecutor, Conley, never got the Patuxent files himself. This was his testimony. Mann just shipped them back into the Sheriff's Department. He didn't believe they'd have any relevance, and that's the reason he did. He interviewed Patuxent staff originally when he first went back to Maryland. The Patuxent staff told him, did Lorenzo and Schubert, that Edwards was fully capable, was entirely rational, knew right from wrong, and was capable of premeditation, deliberation, and lying in wait. So the prosecution never saw the documents? No. The prosecution, as far as I could tell, never saw the documents. Conley didn't recall ever seeing the documents. If they never saw the documents, then how could they possibly have made an informed judgment if they didn't have a duty to turn them over as Brady material? Because the defense throughout the proceedings and at great length explained in great detail outside the presence of the jury that there was no way, in fact they had a lengthy in limine hearing, that prevented the prosecutor from presenting any evidence they might have in Maryland because they specifically limited their defense. By the way, they called it a limited felony phase defense. There were 25 witnesses testifying on Edwards' behalf. I want to clarify something. Did the prosecutor know that the police had received an additional set of documents from Maryland? Not know. Okay. So they didn't make any judgment about whether this was relevant or not? No. The police may have made a judgment about that. The police did. Okay. But the prosecutor himself didn't make any. Not as far as I know. Not as far as came out. The same question that I asked Mr. Schlesinger. Is there anything in those documents that was adverse to Mr. Edwards and that the prosecution might have introduced had the defense decided to change its defense? I think we're focusing on the Patuxent documents. There was a lot adverse in Maryland against Edwards that the prosecutor wanted to. Right. This is all stuff that the prosecutor knew before it received the documents that came in from Maryland. Yes. As a matter of fact, after the first penalty phase, you had an entirely new list of aggravating circumstances. And potential witnesses included Donald Blackwell, to whom Edwards admitted supposedly the Maryland murders and admitted shooting the girls in slow motion and ditching his gun and escaping for five days the manhunt and knew exactly what he was doing throughout the crime. I understand. This was all known before the documents came in from Montgomery County. Yes. Okay. Once you got the Montgomery County documents, is there anything in those documents that the prosecutor did not have access to before that would have been adverse to Mr. Edwards? In other words, is there anything that the prosecutor would have said, well, gee, defense, if you're going to shift your defense, you've just got to be aware, not only are we going to introduce all the stuff we tried to get in in the first place, but there are also all these pages that just came in from Montgomery County that are also really bad for you, and I'm going to put them on as well. I don't know. The prosecutor didn't have that, so I really don't know the answer to that question. Let me back up because there was something counsel said, and you're talking about the Patuxent documents. He said that defense counsel only had 30 pages of it. That's not true. They had, by my count, 228 pages from the file. They had every single page from 1970 onwards. Now, that is significant. You're saying then, counsel, that the marginal difference between the Montgomery County documents and what they previously had was about 200 pages. Yeah, and it was 200 pages that were the earlier pages that are repeated in the later pages. They had 123-page 1976 redetermination transcript plus those 228 pages. Now, the 1976 transcript is interesting because you have Florenzo, who's one of their state habeas declarants, who's testifying in that 1976 hearing. Oh, I had access to the entire file. I've read the entire file. He testifies to that in the 1976 redetermination hearing. And what does he tell Detective Mann when Detective Mann interviews him? Edwards is fully capable of premeditating, deliberating, and lying in wait. Nobody at Patuxent has ever found him not responsible for what he does. So does Schubert. My point is he says this to Mann, and he specifically read the entire Patuxent file for the 1976 redetermination hearing. But going back to what trial counsel had, they had 228 pages of the Patuxent file. They had the 1976 transcript. They had the Maryland Circuit Court opinion following the 1976 transcript. They had all the medical, mental health, school, and social records all the way up through to Patuxent from Edwards' birth. They had the investigative reports regarding Edwards' Maryland activities through his departure from Maryland. They had Edwards' entire correspondence throughout the 1970s leading up to the redetermination hearing and so forth. There's very little they didn't have. It's amazing how much they did have. They had the fainting incident. That's in the Patuxent files they did have. What they did not have was the follow-up medical report, which was negative and hurt Edwards. That's what they didn't have to that 1970 fainting incident. He also mentioned something about head injuries inflicted by other inmates. Did they have that? I don't think they had. I think there were two incidents in the 1970 fainting incident where he was hospitalized. I think he fell down once. He struck his head once, and he came back. There's nothing untoward that happened after that. They didn't keep him in the hospital. They didn't say there was anything wrong with him. As I mentioned in the brief, because I had to give you a full background of all of this, Edwards complained about everything while he was in Patuxent. He was basically a medical malingerer. Yes, he complained a lot about headaches, but he complained about everything else. And he was accommodated throughout. So you have to put that in perspective, which Dr. Vickerhoff didn't. Dr. Walsh was an incident here. Dr. Walsh testified at trial, and we cross-examined her on this, that she told that Giannini specifically asked her to look for diminished passage in his letter. She specifically told Giannini, I have all the raw data that will support whatever I tell you. She said, what I'm testing for organic brain damage has over a 90% reliability. And she told him, I don't see any signs of organic brain damage, period. What he has is some psychosis, psychological problem, not organic brain damage. She contradicted her state habeas declaration in the testimony before Judge Carney. Now, Dr. Vickerhoff was mentioned. When Judge Carney questioned Dr. Vickerhoff about impulsivity, he says, what specific acts of Edwards have you ever seen that were impulsive? He says, I can't think of any. He couldn't give him any answer. All he could talk about was, as counsel for Edwards says, repetitive descriptions of Edwards as impulsive. But if you look at that, where he's described as impulsive, each psychologist is just referring back to earlier descriptions of Edwards as impulsive. But Dr. Vickerhoff couldn't. He eventually said later on, well, all these rules, violations, it shows he was impulsive. But he couldn't come up with any acts of impulsivity. According to the prosecution's theory of the case, this couldn't have been an impulsive act. Could it be because he waited for the girls? Right. And he followed them and was waiting for them and knew that they were there. Right. And that was the whole theory of the lying in wait. Right. So I guess why – and we had the victim's testimony. One of the girls recovered. Right. And she testified as to these circumstances. Why was this such a close case before the jury? In the penalty phase? Yeah. Because Edwards' trial attorneys did such a great job. They presented 25 witnesses. The jury sees this man as a peaceful man who's never committed a crime in his life, and there are 25 witnesses to testify to his character. And there are witnesses that are all around the time of the crimes. So you're saying that the witnesses that the defense put on testified that this was not a person who should be held accountable for a first-degree murder death penalty crime because he's such a good guy? Yeah, this was a completely out-of-character crime. We don't know what the motive could be. And the defense requested a related point, an instruction that if there's no motive, you can consider that in determining whether or not he's premeditated and deliberated. Now, their defense would have brought in a motive, at least in rebuttal impeachment, of a sexual sadism. He went back – there was plenty of circumstantial evidence that he went back and he opened up the tailgate of that truck before the hunters came across him. The hunters came across him by a fluke of luck. One of the hunters happened to be looking – Charles Vaughn happened to look to his left out of the truck in which he was riding as it passed over a speed bump on its way out of the campground. And right that second, he spotted a man in the distance across a meadow, running between the front and back of his pickup truck. By the way, the victim that lived heard the banging at the back of the truck as if the tailgate was going up and down. And based on the man's movements – remember, he was far away from anybody. He was in a remote area because that's where he chose to commit his lying in wait. The witness suspected the man was poaching deer. He didn't see anything else. And that's the only reason he got on a CB radio and called the other hunter. And that's the only reason they drove down this winding path and stumbled across the girls and Edwards driving away. I understand that. I understand that. I guess I just – I'm just trying to think. I guess this would be better addressed to Mr. Schlesinger, but I guess I'm trying to think how these documents that indicate that the fellow was really – the pattern of earlier life and all of these terrible things that happened to him with some expert conclusions that this was a very bad background, how that would have played into any kind of defense at the penalty phase that he should not be held accountable for first-degree murder. Were you at the penalty phase or at the guilt phase, if I may ask? Either. Well, I guess their argument is it would bear on some kind of mercy. Mercy. Right. Okay, but in the guilt phase, if I understand the controller's question, how would this defeat a finding of premeditation and deliberation? Is that what – Well, I mean, my answer is it wouldn't. Wouldn't. Because of the – I mean, the facts of the crime, which – and there are cases I cited in Pelley's brief which say that when you have very detailed facts of a crime that show a very deliberate action like that, testimony of the kind that Edwards' habeas attorneys want to bring in, especially considering the impeachment they would have got, wouldn't have been very convincing. What it would have done was it would have hurt Edwards' case by showing that – by giving a very plausible motive for hunting down these girls, opening up the rear of the truck after they were shot, and loading their bodies and driving them off, and doing God knows what to these girls to carry out his sexual fantasies. That would have proven premeditation and deliberation. That would have killed Edwards' chances at the guilt phase. Because his whole guilt phase defense was this is a completely spontaneous shooting. It had no rhyme or reason to it. There wasn't any precondition motivation for Edwards to do what he did. Okay. At the penalty phase, could any of this have assisted in saying, in his arguing that despite these bad things in his background, he's overcome it with all this good behavior with all these other witnesses? Would that have assisted in any way there? It might have if he hadn't killed a girl and attempted to kill another one. So he hadn't. It didn't make him into too good a character. And you could have brought in his relationship with his wife, which wasn't good. Could it have helped him at the penalty phase in the sense that he has these demons that he was born with and he is therefore less morally culpable, shouldn't be put to death, should be sent to prison for life instead, because these are the cards that God dealt him. Now that is a very interesting philosophical point. That's the one thing maybe that I could agree with Edwards' counsel on. He was born this way. There was nothing wrong with his adopted mother. She was not an alcoholic. There was nothing wrong with his adopted father. He loved him, and my brief goes into this. There was nothing wrong with his Maryland life. The only thing wrong with him was him. He wasn't a victim. He was a victimizer. But he started off that way in nursery school, and he's been the same ever since. He's always been the same. The reports on him by the psychologists have always been the same. And he more than likely was born this way, so what do you do with that? Well, I submit, I mean, that's a very interesting point, but I don't think it's an effective ‑‑I don't think you have to go with that to be an effective attorney. Or he might have been able to make some of that argument anyway. Pardon? He might have been able to make some of that argument anyway if it would have done him any good because he knew his own background of what happened to send him to the Pawtuxet. Well, he might have. But, I mean, this discussion started with it being a close penalty phase, and I think what made it a close penalty phase was the defense chosen by ‑‑ the penalty phase defense chosen by his trial counsel. And, by the way, Giannini never testified, never said in his declaration ever that he would have opted for that defense. That's the one thing you'll never have seen him say. And ‑‑ And you would say that that would be almost inconsistent with the defense, would you? Yeah, it would have been inconsistent by the time the prosecution got through with it. I wanted to make a point about the privilege. The acts he did with his wife were not privileged. We litigated this in the California Supreme Court. They made a motion to strike the opposition for that ground, and we showed in points and authorities why acts such as this aren't privileged, particularly where you're attempting to base a defense on your divorce and your breakup with your wife, and particularly where you're presenting this to third parties such as Charlotte Tibblejass, who testified about it in the second penalty phase, and presenting your mental health experts for this who then testify. I mean, that isn't privileged. The other point I wanted to make in a reply brief, they were saying Section 29 was prospective only. That was the penal code section that said that experts cannot testify as to a state of mind. That's for the jury. No, that applied to Edward's trial because it was a procedural evidentiary rule rather than a substantive rule on a defense or a crime. And that is why I cited those cases that stated that, no, experts could not have testified about Edward's state of mind at Edward's trial. Even though he committed his crime earlier, that doesn't make any difference. And that's what the California Court of Appeal case that I cited said. And, no, that's not the same as the diminished capacity law, which, of course, would have applied and did apply. That procedural limitation also applied. And that's what that particular case I cited in my brief said. Unless there are any further questions about any of the issues, I'll submit it on the briefs. Thank you very much. Thank you. Judge Schroeder, I think I wanted to come back to your question about impulsivity, because this was, I think, an issue that Judge Carney had some trouble with. There clearly was some degree of planning involved in this. If nothing else, he pulls up and says, hey, girls, to attract their attention and shoots. That's planning. Planning isn't a term of art in California criminal law. There are different types of planning. There's that type of planning that I just mentioned that's intent. And then there's premeditation and deliberation, which isn't planning. If you want to use the term planning, it's planning in advance. And California law at the time required not simply planning in advance, but planning that involved meaningful and mature consideration of consequences, pro and con. So unless you buy this argument, which I think is pretty thin, that there was, in fact, a sexual motive for this crime, and it was to act out a sexual fantasy because he wasn't married anymore and his wife wouldn't do it, it's clearly an impulsive act. Most likely it's, I'm having a miserable life. Here are these innocent children. They're not going to have a wonderful life because I don't have a wonderful life, or some sort of very reprehensible impulse like that. But the question becomes, he may have held that impulse in check for two or three minutes. And I emphasize may have because that presupposes he saw the girls the first time and drove around thinking, I'm going to shoot when they get to a certain point. The evidence is very weak that he saw them. That goes to a jury question, I guess. I'm not sure how that's relevant for us. Well, you're asking why, given those facts, how impulse could help. And the impulse defense is it was impulsive, whatever motivated it, whatever internal stimulus he was responding to, it was impulsive and he may have held it in check for a minute or two or three or five. But that doesn't establish premeditation and deliberation. But couldn't you have argued that anyway? Well, but there wasn't any mental health. Figure out what these documents would have, what else there was. Well, in essence, they're a link in a chain. And I think it was Judge Silverman's question initially where I was describing how experts would have used them. And I think the question is, well, what did they say on their face? The problem is these are medical documents. They're not for layperson people to recognize the immediate significance of. You give them to experts and you see what the experts can make of them. Okay. And it looks like my time's up, but if there are other questions. Thank you. Thank you, counsel. The matter, as argued, is submitted for decision. The court thanks counsel for the arguments on both sides. And the court stands adjourned. All rise. This court is adjourned. This court is adjourned. That's it. Thank you.
judges: Schroeder, Silverman, Bybee